Filed 2/4/22  Northern Cal. Environmental Defense Center v. City of Chico CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| NORTHERN CALIFORNIA ENVIRONMENTAL DEFENSE CENTER, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF CHICO, <br><br> Defendant and Respondent; <br><br> EPICK HOMES et al., <br><br> Real Parties in Interest and Respondents. | C092612 <br><br> (Super. Ct. No. 18CV04048) |

This action arises from respondent City of Chico's (the City) approval of a mixed-use development project, Stonegate (Stonegate or the project).  Northern California Environmental Defense Center (appellant) appeals the trial court's denial of its petition for writ of mandate against real parties in interest and respondents Epick Homes, Epick, Inc., and Chris Giampaoli (together, Epick), as well as the City (collectively,

1

respondents).  Appellant contends the project is inconsistent with the City's 2030 General Plan (the general plan) because the project is not an infill development and does not reinforce the compact urban form, as shown by the project's location and its anticipated greenhouse gas (GHG) emissions.  We find no merit to appellant's contentions and affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

I

*Factual Background*

A.    *The Stonegate project*

Epick seeks to develop a 313-acre area of land in the southeast quadrant of the City as a mixed-use development, Stonegate.  The project subdivides the site primarily into single-family residences (94 acres), multifamily residences (13.4 acres), commercial buildings (23.6 acres), parks (3.3 acres), a bicycle path (0.7 acres), and 131.1 acres of preserved, open space.  The project is located east of the City's "Greenline," which separates the City's urban area from agricultural land further to the west.  The project is divided into four parcels.  The westernmost parcel is contiguous to existing development on the west edge, and the southwestern portion borders the campus of a proposed high school.  The eastern border runs alongside "Special Planning Area #5," which is an area of undeveloped land the City identified as having significant growth potential.  The northern border abuts a community development on the northwest side and a residential development project on the northeast side.  The southern portion is bordered by Skyway Road, a commercial area.

B.    *The City's general plan*

The City's general plan is a "statement of community priorities to guide public decision-making."  The City considers its land use changes, budget decisions, and development projects against the backdrop of the general plan.  The general plan recognizes that given its breadth, not all goals and policies will be complementary.  As a

2

result, it instructs that "decisions, goals and policies should be examined comprehensively, not individually," and "one component should not succeed at the expense of another."

### 1. *The general plan and the compact urban form*

With respect to land use, the City's general plan goal is "a well-planned, quality built compact urban form." It defines "compact urban development" as "the efficient use of land with a strong integration of uses" in which the City develops or redevelops land using existing infrastructure and public services, while increasing the density and intensity of spaces. This approach is intended to reduce vehicle miles traveled and air pollution, reduce the rate of farmland and habitat conversion, and increase the liveliness of the community.

"Goal LU-1" in the general plan defines the City's goal of a compact urban form as follows: "Reinforce the City's compact urban form, establish urban growth limits, and manage where and how growth and conservation will occur." This goal is supported by the following three policies:

> "Policy LU-1.1 (Planning Area) – Support coordinated land use planning for the Chico Planning Area."

> "Policy LU-1.2 (Growth Boundaries/Limits) – Maintain long-term boundaries between urban and agricultural uses in the west and between urban uses and the foothills in the east, and limit expansion north and south to produce a compact urban form."

> "Policy LU-1.3 (Growth Plan) – Maintain balanced growth by encouraging infill development where City services are in place and allowing expansion into Special Planning Areas."

2.     *The general plan and infill*

With respect to infill, the general plan explains that "[t]he goal of accommodating future housing and job needs within a compact urban form requires successful infill and redevelopment." This priority is reflected in policy LU-1.3, set forth above, which provides that the City's compact urban form is reinforced by "encouraging infill development where City services are in place." Additionally, appellant relies on the following goal and policy regarding infill in the general plan:

"Goal LU-4: Promote compatible infill development."

"Policy LU-4.2 (Infill Compatibility) – Support infill development, redevelopment, and rehabilitation projects that are compatible with surrounding properties and neighborhoods."

Still, the general plan observes that successful infill "can present challenges," specifically, compatible density and design. It notes that policies intended to encourage infill development have been in place since 1994 but have not always been successful.

C.     *Chico's climate action plan and environmental impact report*

The City's decisions about growth and development are also guided by its climate action plan (the CAP). The CAP outlines strategies to reduce GHG emissions and address climate change in furtherance of Chico's efforts towards sustainability. The general plan mentions the CAP as one of several means to address GHG emissions and climate change, while the CAP, in turn, notes that many of its actions are mandated by the general plan.

With respect to new developments, the CAP provides a list of requirements, standards, policies, guidelines, and practices that are applied on a project-by-project basis to "aid in implementing the CAP." The environmental impact report (EIR) prepared for the project evaluated the project against each of the CAP's development metrics and

4

concluded the project was "generally consistent" with the measures. However, it found that the project's anticipated GHG emissions would be "significant and unavoidable."[1]

D. *The City's review and approval of the project*

The City's Planning Commission (the Commission) held public hearings on the project on May 3, 2018, and again on August 30, 2018. Two former Chico city planning commissioners spoke at the hearings, expressing their concerns that the project would not create a cohesive infill development due to its location on the "edge of town." Thereafter, the Commission voted to recommend the Chico City Council (the City Council) certify the EIR and approve the project.

The City Council held a public hearing on September 18, 2018, during which appellant's counsel spoke regarding a letter he sent to the City, arguing in relevant part that the project was inconsistent with the general plan's "mandate of a 'compact urban form,' " given the low density and the lack of a " 'jobs/housing balance' " calculation. The City Council ultimately certified the EIR and adopted the City Council's findings regarding environmental effects, statement of overriding considerations, and mitigation monitoring and reporting program, and approved the project.

In doing so, the City found as follows: "The General Plan will remain internally consistent because the proposed land use designations would reinforce the compact urban form through compatible infill development with appropriate transitions (LU-1, LU-1.3,

---

[1] The EIR used thresholds from the Bay Area Air Quality Management District (BAAQMD) to assess the GHG emissions. The EIR found that the approved project would result in approximately 11,090 metric tons of carbon dioxide equivalent (MTCO2e) annually and 4.64 MTCO2e annually per capita. Because BAAQMD set the thresholds at 1,100 MTCO2e annually and 4.6 MTCO2e annually per capita, the draft EIR concluded that the project's GHG emissions would result in a "significant and unavoidable" impact. The EIR further found that implementation of mitigation measures would reduce the GHG operational impacts, but the impacts would still remain significant and unavoidable.

LU-4, LU-4.2, LU-4.3, CD-5, and CH-5.2) and allow for a mix and distribution of uses that meet the identified needs of the community, helping maintain a healthy balance of housing and jobs (LU-2, LU-2.3.3, LU-4.2.1, H.3, H.3.1, H.3.3, H.3.4, and ED-1.2)." It further found that the environmental review process preceding the project approval "considered impacts and identified mitigation and necessary regulatory compliance that will be required prior to construction," consistent with the general plan.

II

*Procedural History*

In December 2018, appellant filed a petition for writ of mandate in the trial court under Code of Civil Procedure sections 1085 and 1094.5, challenging the City's approval of the project. It alleged respondents violated the Planning and Zoning Law (Gov. Code, § 65000 et seq.), the Subdivision Map Act (Gov. Code, §§ 66410, 66473.5, 66474), and titles 18 and 19 of the Chico Municipal Code, by approving Stonegate, because Stonegate was inconsistent with the goals and policies of the City's general plan and the CAP. Specifically, appellant alleged that the project was inconsistent with the general plan, the CAP, and the California Environmental Quality Act (CEQA) as they relate to GHG emissions. Respondents demurred, arguing appellant was barred from making these claims because it did not first raise these particular objections with the City. The trial court sustained the demurrer with leave to amend.

In November 2019, appellant filed an amended petition, which is the operative pleading. The amended petition asserted the same three claims for relief as the original petition, but claimed the project was inconsistent with the general plan because it was inconsistent with the general plan's goals and policies "calling for cohesive infill development" and "compact urban form," which were "intended among other things to combat sprawl [and] reduce the City's GHG emissions." It alleged the City prejudicially abused its discretion by approving the project notwithstanding those inconsistencies with

6

the general plan. The parties briefed the merits of the amended petition, and the trial court denied it, finding the City did not abuse its discretion in approving the project.

DISCUSSION

On appeal, appellant argues the City abused its discretion when it found that the project was consistent with the City's general plan and approved the project. Specifically, appellant contends the general plan requires new developments to be "infill" and "compact urban form," yet this project qualifies as neither. Appellant insists that (1) the project's location, and (2) the EIR's conclusion that the project will result in "significant and unavoidable" GHG emissions, both provide substantial evidence that the project is inconsistent with the general plan's policies regarding infill and the compact urban form. We are not persuaded.

A. *Applicable legal standards*

" 'A city or county must adopt a "comprehensive, long-term general plan" for its physical development. [Citation.] The general plan must include "a statement of development policies and . . . objectives, principles, standards, and plan proposals" and elements addressing land use, circulation, housing, conservation, open space, noise, and safety. [Citation.] The general plan serves as a "charter for future development" [citation] embodying fundamental policy decisions [citation]. The policies in a general plan typically reflect a range of competing interests.' [Citation.]" (*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 618, quoting *Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1194.)

" ' " 'An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment.' [Citation.]" [Citation.] State law does not require perfect conformity between a proposed project and the applicable general plan . . . . [Citation.]' (*Friends of Lagoon Valley*[ *v. City of Vacaville* (2007)] 154 Cal.App.4th [807,] 817.) In

7

other words, 'it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. . . . It is enough that the proposed project will be compatible with the objectives, policies, general land uses and programs specified in the applicable plan. [Citations.]' (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1510-1511.)" (*Pfeiffer v. Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1563.) " ' "[B]ecause policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes." ' " (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 515 (*San Francisco Tomorrow*).)

We review the City Council's finding of consistency with a general plan for an abuse of discretion. The Courts of Appeal differ on whether a finding of consistency is a quasi-judicial action, subject to substantial evidence review (see *San Francisco Tomorrow, supra*, 229 Cal.App.4th at p. 514 [reviewed by administrative mandamus]), or a quasi-legislative action, subject to an arbitrary and capricious standard (see *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782 [reviewed by ordinary mandamus]). However, these standards of review are "not materially different . . . . The question for us 'is whether the City's finding of consistency with the general plan was reasonable based on the evidence in the record.' " (*Sacramentans for Fair Planning v. City of Sacramento* (2019) 37 Cal.App.5th 698, 707.)

To make this determination, we grant substantial deference to the City's finding of consistency, recognizing it "has unique competence to interpret those policies when applying them in its adjudicatory capacity." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142.) " '[A] determination of general plan consistency will be reversed only if, based on the evidence before the local governing body, ". . . a reasonable person could not have reached the same

conclusion." ' " (*Sacramentans for Fair Planning v. City of Sacramento, supra*, 37 Cal.App.5th at pp. 707-708.)

### B. *Analysis*

#### 1. *Infill and compact urban form*

Appellant first argues that the project is not an infill development, rendering it inconsistent with the general plan's goals and policies regarding infill. We conclude the City's finding to the contrary was not an abuse of its discretion.

##### i. *The general plan does not mandate infill development*

"A project is inconsistent if it conflicts with a general plan policy that is fundamental, mandatory, and clear. [Citation.]" (*Endangered Habitats League, Inc. v. County of Orange, supra*, 131 Cal.App.4th at p. 782.) Here, while the general plan seeks to *promote* compatible infill developments in the City (goal LU-4), which successfully blend into the surrounding neighborhoods (policy LU-4.2 & policy LU-4.3), it does not *mandate* that all new developments constitute "infill" developments. (See also policy CD-5.1 ["[e]nsure that new [infill] development . . . reinforces the desirable elements of its neighborhood"] & policy CD-5.2 [encourage infill compatible with the architectural scale and character of the neighborhood].) In other words, the general plan "encourag[es] infill" (policy LU-1.3), but does not require it. Thus, whether the project qualifies as "infill" does not, by itself, show inconsistency with a fundamental and mandatory policy in the general plan. Instead, infill is just one of the several strategies proposed by the general plan to support its overarching goal of maintaining a compact urban form (see goal LU-1; policy LU-1.3).

##### ii. *The project could reasonably be described as infill promoting the compact urban form*

Further, to the extent appellant argues that because the project is not infill, the project necessarily fails to maintain the City's compact urban form, we also are not persuaded.

9

First, one could reasonably conclude, consistent with the evidence and the City's finding, that the project constitutes an infill development that reinforces the compact urban form. The general plan defines "[i]nfill [d]evelopment" as "[d]evelopment that occurs on vacant or partially developed land within areas that are already largely developed and served by public infrastructure." Here, the project is adjacent to single- and multifamily residential homes on the north side, single-family homes on the west side, and a commercial area to the south. Specifically, it borders the campus of a proposed high school on its southwest side, and Special Planning Area #5 on its east side, which has been identified as an area with significant growth potential, to be developed as a "connected and complete" neighborhood. Further, it links to an adjacent neighborhood and includes parks, a bike path, sidewalks, and roadways that connect to existing infrastructure, including public transit. The project therefore could reasonably be defined as infill that promotes the compact urban form by efficiently using the land and connecting to existing infrastructure and public services.

The evidence to which appellant points does not persuade us otherwise. Appellant relies on public comments from two former city planning commissioners generally disputing the City's characterization of the project as "infill" based on the project's location. Appellant further cites to photographs and maps of the proposed development, which it asserts show the project is on a "greenfield site" far from the edge of the City, without many urban uses along its border. However, as discussed, nearly half of the project is immediately adjacent to existing urban areas, while the remaining borders abut either a road (to the south), planned structures and developments, and a special planning area, and the project is connected to existing transit and pathways. The City Council could reasonably find this consistent with the general plan's definition of infill.

More broadly, regardless of whether the project is characterized as "infill," the project's location is consistent with the general plan's policies to reinforce the City's compact urban form, goal LU-1. The project maintains long-term boundaries between

10

urban and agricultural areas by its location east of the Greenline (policy LU-1.2) and it is both adjacent to existing neighborhoods and allows expansion into Special Planning Area #5 (policy LU-1.3). And, appellant does not claim that the project fails to support coordinated land use planning (policy LU-1.1). Thus, the City Council did not abuse its discretion in concluding the project's location and connection to infrastructure maintains the City's compact urban form and is therefore consistent with the general plan.

### 2. *GHG reduction and compact urban form*

Appellant argues that because the project's projected GHG emissions are significant and unavoidable, the project is inconsistent with the general plan's requirements for a compact urban form. Appellant acknowledges that it cannot challenge the legal adequacy of the EIR nor the City's analysis of GHG impacts under CEQA.[2] Instead, it contends that the projected GHG emissions constitute substantial evidence that the project is not a compact urban form. Again, we are not persuaded.

The general plan does not prohibit developments that produce GHG emissions, and appellant cites to no such policy. Nor does the general plan create a GHG emissions threshold required for new developments to qualify as ones that maintain the compact urban form. In fact, goal LU-1, which states the City's goal to "[r]einforce the City's compact urban form," does not reference any policies or actions regarding GHG emissions. Thus, even if the GHG emissions are "significant and unavoidable," this

---

[2] Despite this concession, appellant argues at length that the City abused its discretion because the project is inconsistent with the GHG reduction policies in the general plan and in the CAP. We decline to consider this improper argument. The trial court sustained respondents' demurrer to this claim because it was not raised before the City Council. Appellant's amended, operative petition and, therefore, this appeal, solely address appellant's claim that the project is inconsistent with the general plan's goals and policies regarding infill and compact urban form. (*State Compensation Ins. Fund v. Superior Court* (2010) 184 Cal.App.4th 1124, 1131.) We therefore consider the projected GHG emissions only as potential evidence in support of this claim.

11

finding alone does not render the project inconsistent with the general plan's goal to maintain the compact urban form.

Further, even if we considered the CAP to be incorporated into the general plan, as appellant urges, the EIR assessed the CAP's consistency with the project and concluded the project was "generally consistent with the [CAP's] new development measures." Although it noted thereafter that the GHG emissions would be considered "significant and unavoidable," it also offered mitigation measures, which the City Council agreed to implement. Appellant does not show how these anticipated GHG emissions, even if significant, defeat the City's finding that the project will maintain the compact urban form.

More fundamentally, the City's general plan requires flexibility, as not all goals and policies will be complementary, giving the City discretion to balance priorities. (See *San Francisco Tomorrow, supra*, 229 Cal.App.4th at p. 515.) Thus, the fact that the project may result in significant GHG emissions does not, in itself, defeat consistency with the general plan. As noted, the project generally employs the strategies outlined in the City's plan to maintain the compact urban form. It also promotes additional goals set forth in the general plan, such as preserving open space, creating housing, and creating residential, commercial, and recreational opportunities to enhance the quality of life for local businesses and employees. We find no abuse of discretion.[3]

---

**3** Appellant's opening brief initially states its intent to appeal the trial court's final order denying its motion to tax or strike costs. However, as appellant does not support this passing contention with argument or authority, we consider the contention forfeited. (Cal. Rules of Court, rule 8.204(a)(1)(B); *People v. Carroll* (2014) 222 Cal.App.4th 1406, 1412, fn. 5.)

12

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


                                                   KRAUSE        , J.


We concur:


     HULL          , Acting P. J.


     HOCH         , J.