Filed 3/11/15  Saddleback Canyons Conservancy v. County of Orange CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SADDLEBACK CANYONS CONSERVANCY et al., | |
| Plaintiffs and Respondents, | G049040 |
| v. | (Super. Ct. Nos. 30-2012-00609766, 30-2013-00625000) |
| COUNTY OF ORANGE et al., | O P I N I O N |
| Defendants; | |
| RUTTER SANTIAGO LP, | |
| Real Party in Interest and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Steven L. Perk, Judge.  Reversed.  Motion to strike section III.B.1.c. from appellant's reply brief.  Granted.

Perkins Coie, Stephen L. Kostka, Barbara J. Schussman; Manatt, Phelps & Phillips, Susan Hori and Roger Grable for Real Party in Interest and Appellant.

Shute, Mihaly & Weinberger, Ellison Folk and Edward T. Schexnayder for Plaintiffs and Respondents.

*      *      *

INTRODUCTION

The Orange County Board of Supervisors (the Board) approved the Saddle Crest Homes area project (the Project), and also approved amendments to the Orange County general plan (the General Plan) and the "Foothill/Trabuco Specific Plan" (the Specific Plan), which covers the area in which the Project is to be built. Environmental and community groups brought suit. After a hearing, the court entered judgment against the County of Orange (the County) and the Board, preventing the Project from moving forward. Rutter Santiago LP (Rutter Santiago), the developer of the Project and a real party in interest, appeals from the judgment.

We reverse. Having reviewed the Board's actions in certifying an environmental impact report (EIR) for the Project, approving the Project, and amending the General Plan and the Specific Plan, we find no prejudicial abuse of discretion on the part of the Board. Its actions and findings were supported by substantial evidence, were not arbitrary or capricious, and were consistent with the General Plan.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

The Project is located in an unincorporated portion of Orange County in an area subject to the Specific Plan. The Specific Plan was adopted in 1991. The General Plan designates the Project site as suburban residential, which allows development of 0.5 to 18 dwelling units per acre. The Cleveland National Forest is north of the Project site. East of the Project site is a 78-residence development known as Santiago Canyon Estates, which was approved before the approval of the Specific Plan and was grandfathered into the Specific Plan. Santiago Canyon Road is immediately to the west of the Project, and

2

the Limestone-Whiting Wilderness Park and the Portola Hills residential community lie west and south of the Project site, on the other side of Santiago Canyon Road; Portola Hills, which is a part of the City of Lake Forest, was in existence before the Specific Plan was approved.

In 2003, Rutter Santiago proposed to develop the Project site, as well as three other sites near Santiago Canyon Road. The Board approved the development plan, certified an EIR, and approved a zoning change to the Specific Plan. This court, however, set aside the Board's approvals and certification. (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777 (*Endangered Habitats League*).)

After this court's opinion became final, Rutter Santiago sold over 300 acres of the Project site to The Conservation Fund, and about 84 acres of the Project site to the Orange County Transportation Authority. These areas are now designated as conservation sites.

Rutter Santiago then designed a new project on a 113-acre parcel, which would have 65 homes on about 34 acres. The remainder of the parcel will be set aside for open space.

In addition to requesting approval of the Project itself, Rutter Santiago had also sought approval of various amendments to the General Plan and the Specific Plan. These included:

1. An amendment to the General Plan's transportation implementation manual to change the methodology used to forecast the level of service on Santiago Canyon Road.

2. An amendment to the General Plan to change the land use element to provide: "The purpose of the New Development Compatibility Policy is to ensure that new development is compatible with adjacent areas and that it provides either a land use buffer or transition to reduce the effects of one land use on the other. [¶] Sensitive

3

treatment is required where one urban use transitions to another and where an urban use is introduced into an essentially undeveloped area.  [¶] New development within the Foothill-Trabuco Specific Plan planning area shall be designed to maintain a buffer between urban development and the Cleveland National Forest, to be compatible with the area, and to reflect the goals and objectives of that Plan."

3.  An amendment to the General Plan regarding interpretation of the General Plan and the Specific Plan and consideration of environmental consequences of proposed development actions.

4.  An amendment to the Specific Plan acknowledging changes in the County and advances in scientific and technical information since the adoption of the Specific Plan.

5.  An amendment to the Specific Plan, which would allow alternative standards for grading and lot size to be approved if the alternative standards would implement the Specific Plan's goals in ways that would provide greater overall protection of environmental resources than the default standards.

6.  Amendments to the Specific Plan to improve the effectiveness of its oak tree mitigation standards.

7.  An amendment to the open space regulation in the Specific Plan, providing that the 66 percent of land on a developed site, which must be preserved as open space, need not be only untouched "natural" open space, but may also include other open space as well.

The County prepared a draft EIR and a final EIR, which included comments to the draft EIR and the County's responses to those comments.  The County's planning commission held two hearings on the EIR and the Project.  The planning commission ultimately recommended that the Board certify the final EIR, approve the amendments to the General Plan and the Specific Plan, and approve the Project.

4

On October 2, 2012, at a regularly scheduled meeting, the Board certified the final EIR (resolution No. 12-147), adopted the amendments to the General Plan (resolution No. 12-148) and the Specific Plan (ordinance No. 12-031), and approved the Project (resolution No. 12-149). As is relevant to the present appeal, the Board made the following specific findings:

"1. Approval of the Saddle Crest Homes Area Plan ('Area Plan') is in compliance with the requirements of the California Environmental Quality Act.

"2. The Area Plan is consistent with the objectives, policies and general land uses and programs of the General Plan.

"3. The Area Plan is consistent with the Transportation Element of the General Plan, as amended, including, but not limited to, the Level of Service policy and Scenic Highways viewscape corridor component applicable to Santiago Canyon Road[.]

"4. The Area Plan is consistent with the Goals and Objectives of the Foothill/Trabuco Specific Plan, including, but not limited to the goals and objectives relating to preservation of the rural character of the area, the provision of a buffer between urban development and the Cleveland National Forest, the preservation of significant landform, biological and scenic resources.

"5. The Area Plan is in compliance with all applicable Foothill/Trabuco Specific Plan Components and Regulations, as amended.

"6. The Area Plan complies with the Foothill/Trabuco Specific Plan Upper Aliso Residential District regulations, as amended, and is consistent with the purpose and intent of the Upper Aliso Residential District regulations.

"7. The Area Plan is inconsistent with some of the Foothill/Trabuco Specific Plan Guidelines, but is in over all compliance with the Foothill/Trabuco Specific Plan Guidelines.

5

"8. The uses, activities and improvements proposed, subject to the specified conditions of approval, are consistent with the provisions of the Zoning Code and the Foothill/Trabuco Specific Plan regulations applicable to the property.

"9. The location, size, design and operating characteristics of the use proposed in the Area Plan will not create conditions or situations that may be incompatible with other permitted uses in the vicinity."

On October 31, 2012, Saddleback Canyons Conservancy, Rural Canyons Conservation Fund, Friends of Harbors, Beaches and Parks, and National Audubon Society, each of which is an unincorporated association, nonprofit organization, or corporation dedicated to protecting natural resources and the environment (collectively, Saddleback), filed a verified petition for a writ of mandate and complaint for injunctive relief, challenging the approval of amendments to the General Plan and the Specific Plan, the approval of the Project, and the certification of the EIR. A first amended petition and complaint was filed on December 5, 2012.

On January 18, 2013, Saddleback filed a verified petition for a writ of mandate and a complaint for injunctive relief, challenging the approval of the tract map for the Project. Pursuant to a stipulation of the parties, the two cases were consolidated for all purposes.

Following briefing and a hearing, the trial court granted the petition for a writ of mandate, ordered the County and the Board to vacate and set aside certification of the EIR, amendments to the General Plan and the Specific Plan, and approvals for the Project, and enjoined the County and the Board from further actions to implement the Project without complying with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). The peremptory writ issued, and judgment was entered. Rutter Santiago appealed; the County did not file its own appeal, nor did it join in Rutter Santiago's appeal.

6

DISCUSSION

I.

*STANDARD OF REVIEW AND POLICIES REGARDING GENERAL AND SPECIFIC PLANS*

A.

*Standard of Review*

"In reviewing a petition challenging the legality of a lead agency's actions under CEQA, our role is the same as the trial court's. We review the agency's actions, not the trial court's decision, and our inquiry extends 'only to whether there was a prejudicial abuse of discretion' on the part of the agency. [Citations.]" (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 923.) We review the Board's decisions to determine "whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5; see *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427.) "For purposes of CEQA, substantial evidence 'means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.]" (*Rialto Citizens for Responsible Growth v. City of Rialto*, *supra*, at p. 923.)

"Questions concerning the proper interpretation or application of the requirements of CEQA are matters of law. [Citation.] CEQA requires that an EIR include detailed information concerning, among other things, the significant environmental effects of the project under consideration. [Citations.] When the informational requirements of CEQA are not met but the agency nevertheless certifies the EIR as meeting them, the agency fails to proceed in a manner required by law and abuses its discretion. [Citation.] '"The EIR is the heart of CEQA," and the integrity of the process is dependent on the adequacy of the EIR. [Citations.]' [Citation.] [¶] In

7

reviewing the lead agency's actions under CEQA, we do not "'""pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.'" [Citation.] We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. 'Our limited function is consistent with the principle that "The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations."' [Citations.] We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements.'" [Citation.] [¶] The Legislature intended CEQA "'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.'" [Citation.] 'The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to "take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state." [Citation.] . . . An EIR is an "environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return." [Citations.] The EIR is also intended "to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action." [Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government.' [Citation.] [¶] An EIR is presumed legally adequate, however [citations], and the agency's certification of an EIR as complying with the

8

requirements of CEQA is presumed correct [citation].  Persons challenging the EIR therefore bear the burden of proving it is legally inadequate, or that insufficient evidence supports one or more of its conclusions.  [Citation.]  [¶] '"[T]he ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the project that is required by CEQA."  [Citation.]  The error is prejudicial "if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process."  [Citation.]'  [Citation.]  [¶] Still, '"[a]bsolute perfection is not required,"' and the level of analysis in an EIR 'is subject to a rule of reason.'  [Citation.]  The absence of information in an EIR does not per se constitute a prejudicial abuse of discretion.  [Citation.]  Instead, '"[a] prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.  [Citation.]"  [Citation.]'  [Citation.]"  (*Rialto Citizens for Responsible Growth v. City of Rialto*, *supra*, 208 Cal.App.4th at pp. 923-925.)

## B.

### *General Plan*

"[T]he general plan [is] a '"constitution" for future development' [citation] located at the top of 'the hierarchy of local government law regulating land use' [citation].  [¶] The general plan consists of a 'statement of development policies . . . setting forth objectives, principles, standards, and plan proposals.'  [Citation.]  The plan must include seven elements—land use, circulation, conservation, housing, noise, safety and open space—and address each of these elements in whatever level of detail local conditions require [citation].  General plans are also required to be 'comprehensive [and] long[]term' [citation] as well as 'internally consistent.'  [Citation.]  The planning law thus compels cities and counties to undergo the discipline of drafting a master plan to guide

9

future local land use decisions." (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 772-773, fn. omitted.)

C.

*Specific Plan*

A specific plan, such as the Specific Plan, is usually more detailed than a general plan, and covers specific parts of the community. The approval of a specific plan does not create a vested right to develop property in a manner consistent with the specific plan, or to prevent development inconsistent with it. (*People v. County of Kern* (1974) 39 Cal.App.3d 830, 837-838.) A specific plan may be adopted or amended by resolution or ordinance of the appropriate legislative body. (Gov. Code, §§ 65358, 65453.) Sections 65358 and 65453 of the Government Code recognize that "[a] county's needs necessarily change over time . . . . It follows that a county must have the power to modify its land use plans as circumstances require." (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 357-358.)

A particular project must be "compatible with the objectives, policies, general land uses, and programs specified in" the general plan or any applicable, officially adopted specific plan. (Gov. Code, § 66473.5.) Government Code section 66473.5 has been interpreted "as requiring that a project be '"in agreement or harmony with"' the terms of the applicable plan, not in rigid conformity with every detail thereof." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 678.)

II.

*DID THE BOARD'S CERTIFICATION OF THE EIR VIOLATE CEQA?*

Saddleback identifies three ways in which it claims certification of the EIR was not supported by substantial evidence: (a) failure to adequately analyze the Project's traffic impacts; (b) failure to adequately analyze the Project's traffic hazards on Santiago

10

Canyon Road; and (c) failure to analyze foreseeable environmental impacts of the amendments to the General Plan and the Specific Plan. We consider each contention in turn. When, as here, the issue is whether the EIR's analysis complies with CEQA, we review to determine whether that analysis "reflects a reasonable, good faith effort to disclose and evaluate" the Project's impacts. (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2014) 231 Cal.App.4th 1056, 1071.) In our substantial evidence review, we consider whether there is enough relevant information, and reasonable inferences that can be drawn from that information, to support a conclusion, whether or not other conclusions might also be reached. (*Ibid.*)

A.

*Failure to Adequately Analyze the Project's Traffic Impacts*

In this court's prior opinion, the court concluded that the project, as then constituted, was inconsistent with the General Plan because it would cause an impermissible increase in the flow of traffic on Santiago Canyon Road. (*Endangered Habitats League*, *supra*, 131 Cal.App.4th at p. 782.) Section VI.G. of the County's Transportation Implement Manual (Mar. 15, 1994) of the transportation element of the General Plan read: "The majority of the road miles within the United States consist of two lane roadways. As a result, a great deal of work has been done throughout the country regarding the capacity of two lane roads. The most current information and practice are reflected in the 1997 'Highway Capacity Manual'. [¶] For G[rowth] M[anagement] Element traffic analyses of Santiago Canyon Road, the methodology described in the 1997 'Highway Capacity Manual' (or any subsequent revisions) for rural two lane highways shall be used, based upon peak hour volumes. The directional splits shall be as measured during the peak hours. All other adjustment factors shall be as described in the manual."

The EIR certified in 2003 acknowledged that, using the Highway Capacity Manual (HCM) methodology, the project, as then proposed, would cause the level of

11

service on Santiago Canyon Road to fall to unacceptable levels. (*Endangered Habitats League*, *supra*, 131 Cal.App.4th at p. 783.) The EIR therefore used a different analysis, the volume-to-capacity-ratio (V/C) methodology, under which it found no significant impacts on Santiago Canyon Road caused by the proposed project. (*Ibid.*) In the prior opinion, we concluded the proposed project was not consistent with the General Plan because it would cause significant impacts under the HCM methodology. (*Id.* at pp. 783-784.)

As part of its approval of the Project in 2012, the Board approved an amendment to that portion of the General Plan, which now reads as follows: "For Growth Management Element traffic analyses of Santiago Canyon Road, the traffic level of service policy shall be implemented by evaluating peak hour volumes in relation to the physical capacity of the roadway, using the Volume-to-Capacity methodology. A lane volume of 1,360 vehicles per hour, which is 0.80 times the maximum directional lane capacity of 1,700 vehicles per hour, represents Level of Service 'C'. These lane capacity guidelines shall be used to ensure that the Level of Service 'C' capacity of 1,360 vehicles per hour per lane will be maintained." This amendment was proposed by the County's planning commission because (1) Santiago Canyon Road was the only road in the County to which the HCM rather than the V/C methodology applied, (2) the Cities of Lake Forest and Orange, which both control other parts of Santiago Canyon Road, use the V/C rather than the HCM methodology; and (3) the HCM methodology was not proper for use on Santiago Canyon Road because the physical layout of the road was so different from that of roads on which the HCM methodology is used, particularly with regard to the inability of cars to pass slower moving vehicles.

The capacity of Santiago Canyon Road is 1,700 vehicles per hour in each direction; on average only 20 percent of the road's capacity is used. The estimated 780 additional daily trips created by the Project is less than 1 percent of the total capacity of the road, and will have a negligible impact on traffic. However, using the old HCM

12

methodology, Santiago Canyon Road is currently operating at too low a level of service, and would continue to do so after the Project was built. The traffic engineers provided their expert opinion that the V/C methodology would give more accurate and realistic forecasts than the HCM methodology, based on their experience, as well as on the firsthand comparison of the results of current traffic patterns using the V/C rather than the HCM methodology. The County's traffic engineering division agreed with that opinion.

In light of all the foregoing, we conclude substantial evidence supported the County's certification of the EIR based on the amendment to the traffic analysis methodology in the General Plan.

B.

*Failure to Adequately Analyze Traffic Hazards*

The draft EIR noted that, based on the CEQA guidelines and the County's environmental analysis checklist, a project has a significant adverse effect on transportation if it would "[s]ubstantially increase hazards due to a design feature (e.g., sharp curves or dangerous intersections) or incompatible uses (e.g., farm equipment)." The draft EIR concluded the Project would not introduce any hazardous design features or uses, and mitigation measures would reduce any potential impacts.

In response to public comment, traffic safety at the access site for the Project from Santiago Canyon Road was reviewed, and the final EIR reiterated that no traffic safety issues were likely as a result of the Project. Specifically, the final EIR responds to the public comment as follows: "The commenter states the Draft EIR fails to adequately analyze the project's potential to increase traffic hazards, but provides no analysis or evidence to support the conclusion. The comment also refers to 2010 newspaper article that demonstrates potential accidents . . . . The project impact on traffic safety is assessed in terms of project-caused changes to roadway configurations and/or to the characteristics of traffic flow, and in terms of the effect of introducing added traffic volumes with the prevailing roadway features (e.g., available sight distance). A

13

key consideration when judging traffic safety impacts is whether the project would change the rate of accidents. Without a change to the physical character of a roadway, or to the mix of vehicles (autos and trucks) on a roadway, the accident rate (i.e., accidents per number of vehicles, or accidents per million vehicle miles traveled) will not change. The proposed project would neither introduce dangerous road design features, nor generate traffic that is incompatible with existing traffic patterns. Available sight distance for motorists wishing to turn from the project site access onto Santiago Canyon Road would be sufficient. [¶] In addition, a 2010 evaluation of five years of collision data on Santiago Canyon Road by the Orange County Department of Public Works (Road Division) indicates that the prevailing accident rate on Santiago Canyon Road just north of the project site is substantially below the State Expected Rate for similar type roadways." (Fn. omitted.)

Saddleback criticizes the certification of the EIR because the 2010 evaluation referenced in response to public comment was not included, and because that evaluation apparently did not consider the accident rate south of the Project site. That the final EIR did not include the 2010 report referenced *ante*, or that the report apparently considers the accident rate north of the Project site, and not south of the Project site, does not matter. The draft EIR sufficiently met the County's requirements under CEQA, and the comments to the draft EIR did not require the County to do anything more.

C.

*Failure to Analyze Foreseeable Environmental Impacts of the Amendments to the General Plan and the Specific Plan*

Saddleback contends the EIR fails to analyze foreseeable environmental impacts of the amendments to the General Plan and the Specific Plan. The amendment of a general plan or specific plan may require an environmental review. (Pub. Resources Code, § 21100; Cal. Code Regs., tit. 14, § 15378, subd. (a)(1).) The draft EIR acknowledged that the amendments being contemplated by the Board would have

14

environmental impacts: "These Specific Plan amendments would result in a direct growth inducing impact because the amendments would remove obstacles to development on the project site posed by the existing plan provisions; however, the amendments would not change the density allowed on the site beyond the maximum density permitted in the [Specific Plan], and would not change the uses allowed on the site." The draft EIR and the final EIR directly addressed the environmental impacts of the General Plan and the Specific Plan amendments on the Project site, and concluded the amendments would have no impact, or would have a positive impact.

Saddleback's argument, however, is that the amendments will have environmental impacts by making it easier for other developments in other areas of the County or the Specific Plan area, which impacts must be addressed in the EIR for the Project. The County conceded the amendments would facilitate new development. The question is whether the County was required to analyze the environmental impacts of potential future developments that would take advantage of the amendments to the General Plan and the Specific Plan.

Environmental effects of amendments to a general plan or a specific plan, which would be indirect and which would be difficult to predict with any accuracy, need not be analyzed in detail. (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1229-1230; *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors*, *supra*, 91 Cal.App.4th at p. 369.) The effect of future projects that will use the amendments to the General Plan or the Specific Plan is completely speculative. Both the draft EIR and the final EIR explain that in many instances, the environmental effects of the amendments will be positive, rather than negative.

The cases cited by Saddleback are distinguishable. In *Inyo Citizens for Better Planning v. Inyo County Bd. of Supervisors* (2009) 180 Cal.App.4th 1, 17, the appellate court directed the trial court to set aside a county's general plan amendments that had been approved subject to a negative declaration, and to require the county to

15

prepare an EIR if it desired to amend the general plan. Unlike the present case, in *Inyo Citizens for Better Planning*, the environmental impacts that could reasonably be anticipated if the amendments to the general plan were approved, were concrete and well established. (*Id.* at pp. 8-10.) In *City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 409, the court held that an environmental analysis must be performed on a general plan amendment where "[t]he record . . . clearly indicates the existence of not only potential future development, but at least one existing project undergoing separate environmental review." Nothing in the record before us clearly shows potential future development exists, much less specific development, other than the Project.

In *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 241, the court concluded that the rezoning of a particular area was a "project" that required the preparation of an EIR, and that the county erred in issuing a negative declaration. In that case, the rezoning was the first part of a larger development project; in fact, a development proposal was submitted to the county before the board of supervisors approved the rezoning. (*Id.* at pp. 243-244.)

In *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 396, the California Supreme Court held that "an EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects. Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project. Of course, if the future action is not considered at that time, it will have to be discussed in a subsequent EIR before the future action can be approved under CEQA." Future unspecified development in the Specific Plan area, much less in the County as a whole, is not a reasonably foreseeable consequence of the amendments, and there is nothing from which we can surmise that any future development will change the scope or nature of the

16

General Plan or the Specific Plan.  Therefore, under the rule of *Laurel Heights Improvement Assn.*, the County was not required to specifically address the environmental effects of the amendments on future development.

We conclude the County properly certified the EIR, and no further analysis of future development using the amendments to the General Plan and the Specific Plan was required.

## III.

### *ARE THE AMENDMENTS TO THE SPECIFIC PLAN INCONSISTENT WITH THE GENERAL PLAN AND THE SPECIFIC PLAN?*

Amendments to a specific plan must be consistent with the general plan as well as with other elements of the specific plan.  (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336.)  Consistency requires that the amendment or project, "'considering all its aspects, . . . will further the objectives and policies of the general plan and not obstruct their attainment.'"  (*Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 994.)  If an agency finds that the amendments to a specific plan are consistent with the general plan, we review the agency's quasi-legislative acts to determine whether they are arbitrary, capricious, or without evidentiary support.  (*Endangered Habitats League*, *supra*, 131 Cal.App.4th at p. 782.)  We defer to the agency's findings unless no reasonable person could have reached the same result based on the evidence before him or her.  (*Ibid.*)

### A.

#### *Oak Tree Mitigation Standards*

The General Plan does not contain any specific goals or elements relating to oak trees.  The preservation of biological resources is one of the goals of the Specific Plan, and preserving oak woodlands is one of the Specific Plan's objectives.

17

Ordinance No. 12-031 amended section II.C.3.3.a. of the Specific Plan's resources overlay component, relating to tree management and preservation of the oak woodlands within the Specific Plan area, to read as follows: "a. Any oak tree removed which is greater than five (5) inches in diameter at 4.5 feet above the existing grade shall be transplanted. If any oak tree over 5 inches in diameter is either in poor health and or would not survive transplantation, as certified by an arborist, said tree shall be replaced either according to the replacement scale indicated below or as provided in an approved Tree Management and Preservation Plan designed to provide more extensive and effective mitigation. If any oak tree dies within five years of the initial transplantation, it shall also be replaced according to the replacement scale indicated below or as provided in an approved Tree Management and Preservation Plan designed to provide more extensive and effective mitigation. In the event that a proposal includes an alternative oak tree replacement mitigation, the Approving Authority shall make the following additional finding prior to approval of the Tree Management and Preservation Plan: [¶] 1) The oak tree replacement mitigation proposed in the Tree Management and Preservation Plan is more extensive and effective than if oak trees were to be replaced at a 15-gallon minimum size and by using the 'Tree Replacement Scale' indicated below."[1] The appropriateness of the amendment was supported by substantial evidence. Specifically, Rutter Santiago and the County provided expert studies evaluating the survival rate of transplanted mature oak trees, and supporting the need to use different mitigation measures for the removal of oak trees.

Contrary to Saddleback's protestations, ordinance No. 12-031's amendment of the portion of the Specific Plan relating to tree management and preservation of the Specific Plan does not permit destruction of healthy trees. The amendment is consistent with the Specific Plan's directive to preserve oak woodlands "in an undisturbed state to

---

[1] The language deleted by the amendment is reflected by a strikethrough, while the language added by the amendment is underscored.

18

the greatest extent possible while still allowing for reasonable development." The amendment was not arbitrary, capricious, or without evidentiary support.

B.

*Grading and Lot Size Regulations*

Ordinance No. 12-031 adds subsection n. to section III.D.8.8 of the Specific Plan, regarding site development standards in the "Upper Aliso Residential . . . District Regulations":

"n. Alternative Site Development Standards  [¶] 1) Alternatives to the Site Development Standards in section 8.8(a) (building site area) and section 8.8 (h) (grading standards) may be approved for an Area Plan if the Area Plan would result in greater overall protection of environmental resources than would be provided through compliance with those standards.  Such alternatives may be approved if it is determined that the Area Plan or other plan for development implements the Foothill/Trabuco Specific Plan's goals relating to protection of biological resources, preservation of open space, provision of a buffer between development and the Cleveland National Forest, and protection of significant land form features in a manner that would provide greater overall environmental protection than would compliance with the Site Development Standards in sections 8.8(a) and 8.8(h).  Approval of such alternative standards shall not be subject to the provisions of section III G 2.0 d.  [¶] 2) To the extent that alternative site development standards relating to building site area and grading are approved for an Area Plan as provided in subsection (1), above, those alternative site development standards shall serve as the development and design guidelines for the development in place of the Development and Design Guidelines in section IV C that would otherwise apply.  [¶] 3) In the event that a proposal utilizes the Alternative Site Development Standards within this Section, the Approving Authority shall make the following additional finding prior to approval of the Area Plan:  [¶] a) The alternative site development standards result in greater overall protection of environmental resources than would be the case if the

19

proposal fully complied with the Site Development Standards in sections 8.8(a) and 8.8(h)."

Section III.D.8.8.a. of the Specific Plan provides minimum acreages for building sites,[2] and section III.D.8.8.h. sets limits on grading, and specifies the type of grading that may be used.[3]

---

[2] Section III.D.8.8.a. of the Specific Plan provides: "a. Building site area. [¶ 1) Building sites created prior to the effective date of the Specific Plan shall be considered legal, conforming building sites. [¶ 2) For subdivision maps creating a single building site. Minimum of one (1) acre. [¶ 3) For subdivision maps creating more than one building site. Minimum of one-half (0.5) acre; however, building sites shall average a minimum of one (1) acre for each subdivision map."

[3] Section III.D.8.8.h. of the Specific Plan provides: "Grading. Per Zoning Code section 7-9-139, except as indicated below. Items 1 through 6 below shall apply only to residential development (including private roads providing access to residential development). [¶ 1) Grading shall be limited to an average of 3,000 cubic yards of grading per dwelling unit permitted by the development cap on the property (either cut or fill, whichever is greater), excluding grading required for access roads or driveways serving two or more parcels and any remedial grading required, as certified by a geologist. [¶ 2) For development of a single building site existing prior to adoption of the Specific Plan, grading shall be limited to 3,000 cubic yards of cut or fill on the individual lot (not an average) with the same exclusions provided above. [¶ 3) If a property owner develops fewer dwelling units than permitted by the development cap, the grading allocation for the un-built dwelling units may be applied to those that are built[.] However, in no case shall the number of cubic yards of grading for the project exceed an average of 9,000 cubic yards per building site. For example, if the development cap permits two dwelling units on a property and only one building site is established, the property owner may grade up to 6,000 cubic yards. However, if the development cap permits 4 dwelling units on a property and only one building site is established, the property owner may only grade up to a maximum of 9,000 cubic yards. Where this provision is utilized, a resource or scenic preservation easement (or other restriction) shall be required over the remainder of the property to preclude the development of the un-built units. [¶ 4) Except for grading required for roads and driveways providing access to two or more dwelling units, in no case shall the height of cut or fill slopes exceed ten (10) vertical feet. [¶ 5) Except for grading required for roads and driveways providing access to two or more dwelling units, in no case shall the difference between the existing and proposed contour elevations exceed ten (10) vertical feet. [¶ 6) For private roads and driveways providing access to two or more dwelling units, in no case shall the height of cut or fill slopes exceed thirty (30) vertical feet. [¶ 7) For non-residential development (but excluding roads to serve residential development), in no

The amendment of the Specific Plan to modify the lot size and grading regulations is within the authority of the Board. (Gov. Code, § 65453, subd. (a) ["A specific plan shall be . . . amended in the same manner as a general plan . . . and may be amended as often as deemed necessary by the legislative body."].)

Saddleback correctly notes that the Specific Plan's goals include "preserv[ing] the rural character of the area and provid[ing] a buffer between urban development and the Cleveland National Forest," and "preserv[ing] significant landform[s]." The amendments to the Specific Plan do not frustrate those goals, however, under the substantial evidence standard.

In resolution No. 12-149, the Board approved "the Area Plan for Saddle Crest Homes contained in Planning Application PA 110027." The findings for the Planning Application PA 110027 included a finding that: "The proposed alternative site development standards (specifically grading and lot size) would result in greater overall protection of environmental resources as the project would cluster the development and provide more contiguous open space than if the project fully complied with the Site Development Standards found in Sections III.D.8.8(a) and III.D.8.8(h) of the Foothill/Trabuco Specific Plan."

---

case shall the height or cut or fill slopes exceed thirty (30) vertical feet. [¶] 8) Except for the two situations listed below, contour grading techniques shall be used to provide varying slope percentages and slope direction in three-dimensional, undulating patterns, similar to the natural terrain. The following concepts shall be utilized: [¶] a) Hard edges left by cut and fill operations shall be given a rounded appearance which closely resembles the natural contours. Rounding of cut or fill edges shall extend a minimum of two feet on either side of any daylight line or hinge point located at the top of a manufactured slope or natural slope. [¶] b) The angle of any graded slope shall be gradually adjusted to the angle of the natural terrain. c) Conventional grading techniques may be utilized in the following two situations: [¶] (1) Where geological hazards exist that are best mitigated by more conventional grading methods utilizing linear slopes to best complement required stabilization devices. [¶] (2) When contour grading would result in more significant impacts to natural resources than would conventional grading methods. [¶] 9) The Planning Commission may approve Alternative Grading Standards provided specific findings are made by the Commission pursuant to Section III.G.2.d."

21

The finding that the use of the alternative site development standards regarding lot size and grading would result in greater overall environmental protection is supported by substantial evidence. The Orange County Fire Authority supported the alternative standards because there would be less brush between structures to burn, and response times would be better. The alternative standards also allow for greater amounts of open space by clustering the residences together, while also clustering the open space. According to the director of biological and regulatory services for PCR Services Corporation (which performed various assessments and provided information used in the EIR), doing so would allow the County to "retain greater biological diversity because you're setting aside more open space, in this case native open space. You minimize habitat fragmentation, which occurs when you spread development out and connect it with roads and utilities and fuel modification. [¶] You preserve to a greater extent habitat connectivity where you've got blocks of habitat and ways for the populations of each to exchange with one another. It's easier to mitigate for edge effects and those are things like the trespass of noise and light into adjacent habitat areas. The more edge you have, the greater the chances you're going to have those indirect effects on the habitat and its use by the wildlife. [¶] And it's much better respecting the species area relationship that's commonly referred to in conversation planning where the larger, unbroken blocks of habitat—it's the larger that you have of that, the higher number of species that you can support within there." This amendment to the Specific Plan was neither arbitrary nor capricious.

## C.

### *Open Space Preservation Regulation*

The trial court found that the amendment to the Specific Plan, which changed references from "natural open space" to simply "open space" was inconsistent with the General Plan and the Specific Plan. Rutter Santiago explains in its opening brief why the amendment was not arbitrary or capricious. In its respondent's brief, Saddleback

22

did not address this issue. This court is reviewing the Board's underlying decision, not the trial court's decision. Because there is no argument against the Board's decision on appeal, we need not address this issue.

## IV.

### *IS THE BOARD'S FINDING THAT THE PROJECT IS CONSISTENT WITH THE SPECIFIC PLAN SUPPORTED BY THE EVIDENCE, OR IS IT ARBITRARY?*

Saddleback argues that even if the amendments to the Specific Plan were properly adopted, the Project is not consistent with the Specific Plan, and therefore should not have been approved by the Board. The Board's decision of consistency is a quasi-legislative act, "and the inquiry is whether the decision is arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair. [Citations.] Under this standard, we defer to an agency's factual finding of consistency unless no reasonable person could have reached the same conclusion on the evidence before it." (*Endangered Habitats League*, *supra*, 131 Cal.App.4th at p. 782.)

Saddleback first argues that the Project does not contain at least 66 percent open space, as required by the Specific Plan; Rutter Santiago contends that 70 percent of the Project site will be left as open space. The difference lies in how the parties define "open space." Saddleback contends that the graded areas within the Project site cannot be part of the required open space because they do not fit within the General Plan's definition of open space. The General Plan cites Government Code section 65560, subdivision (b), which defines "'open-space land'" as "any parcel or area of land or water that is *essentially unimproved and devoted to an open-space use* as defined in this section" (Gov. Code, § 65560, subd. (b), italics added), and which is designated as being "for the preservation of natural resources," "for outdoor recreation," or "for public health and safety," among other things (*id.*, § 65560, subd. (b)(1), (3) & (4)). The language of the statute is broad, and gives multiple examples of the types of open space land uses by

23

using the phrase "including, but not limited to" (*ibid.*). The Legislature did not intend to create a narrow definition of the term "open space," and the necessarily broad definition of the term must therefore be read into the General Plan.

The amendment of the General Plan to remove the word "natural," thereby requiring that each project include the necessary amount of open space and not necessarily natural open space, is not inconsistent with the definition of open space from Government Code section 65560. The Project's level of open space is a buffer between developed areas and the Cleveland National Forest, which is a goal of the Specific Plan, and preserves natural resources. Further, as noted during the public hearings on the Project, remedial grading is a public safety issue, and the Project's use of open space is therefore for public health and safety. Therefore, the grading falls within the definition of open space set forth in the General Plan. The Board's finding that the Project is consistent with the Specific Plan is supported by substantial evidence, and is not arbitrary.

V.

*DID THE BOARD IMPROPERLY ADD A PRECEDENCE CLAUSE TO THE GENERAL PLAN IN VIOLATION OF STATE LAW?*

One of the amendments to the General Plan adopted by the Board in resolution No. 12-148 provides: "The Board of Supervisors ('Board') as the legislative body of the County of Orange, has adopted the General Plan and supporting Specific Plans. As such, the Board retains authority to interpret the General Plan and supporting Specific Plans and all of their constituent provisions, including their goals, objectives, policies and implementation measures, such as programs, regulations, standards and guidelines. The provisions of the General Plan and each Specific Plan are to be interpreted in a manner that harmonizes their goals, objectives, policies and implementation measures in light of the purposes of those plans. [¶] It is recognized that

24

in determining plan consistency, no action is likely to be entirely consistent with each and every goal and objective contained in the General Plan or a Specific Plan and that the Board may give greater weight to some goals and objectives over other goals and objectives in determining whether an action is in overall harmony with the General Plan and any applicable Specific Plan in light of the plan's purpose.  [¶] In its decisionmaking, the Board shall also consider the environmental consequences associated with a proposed action in applying provisions of the General Plan or a Specific Plan and whether the action will protect resources in a manner it determines best advances that plan's goals relating to environmental resources."

Rutter Santiago characterizes this language as a summary of "general principles of interpretation applying to the County's General Plan and all adopted specific plans."  To the contrary, Saddleback characterizes the language as an illegal modification giving one element of the General Plan precedence over another, which "directly contravenes the consistency doctrine."

A precedence clause in a general plan is impermissible.  In *Sierra Club v. Board of Supervisors* (1981) 126 Cal.App.3d 698, 703, the open space-conservation element of the county's general plan was adopted in June 1972.  The next year, the county adopted a land use element of the general plan which read, in relevant part:  "'If any conflict exists between the adopted open space and conservation elements and this land use element, this element should take precedence until the open space and conservation can be reevaluated and amended, if necessary.'"  (*Ibid.*)  The court concluded that "the precedence clause under consideration is void as not permitted under [Government Code] sections 65300.5,[4] 65566,[5] 65567[6] and 65860.[7]"  (*Sierra Club v. Board of Supervisors*, *supra*, at p. 708.)

---

[4]  "In construing the provisions of this article, the Legislature intends that the general plan and elements and parts thereof comprise an integrated, internally

25

The amendment to the General Plan under consideration here, however, does not give precedence to one element of the General Plan over another. The amendment recognizes that a single project may not be consistent with all elements of the General Plan, and that the Board may deem some elements to be more or less important in the decisionmaking process to determine whether the project as a whole is consistent with the General Plan and any applicable specific plans, as a whole.

The amendment is consistent with California case law. In *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719, the Oakland City Council found a project under consideration to be fully consistent with 14 of the 17 pertinent policies set forth in the Oakland Comprehensive Plan (OCP), although it was in conflict with three other policies. The appellate court concluded approval of the project did not require consistency with every possible policy set forth in the city's general plan. "Respondents also argue that none of the policies on which appellant relies is mandatory, and that a given project need not be in perfect conformity with each and every OCP policy. We agree. Indeed, it is beyond cavil that no project could completely satisfy every policy stated in the OCP, and that state law does not impose such a requirement. [Citations.] A general plan must try to accommodate a wide range of competing

consistent and compatible statement of policies for the adopting agency." (Gov. Code, § 65300.5.)

[5] "Any action by a county or city by which open-space land or any interest therein is acquired or disposed of or its use restricted or regulated, whether or not pursuant to this part, must be consistent with the local open-space plan." (Gov. Code, § 65566.)

[6] "No building permit may be issued, no subdivision map approved, and no open-space zoning ordinance adopted, unless the proposed construction, subdivision or ordinance is consistent with the local open-space plan." (Gov. Code, § 65567.)

[7] "(a) County or city zoning ordinances shall be consistent with the general plan of the county or city by January 1, 1974. A zoning ordinance shall be consistent with a city or county general plan only if both of the following conditions are met: [¶] (1) The city or county has officially adopted such a plan. [¶] (2) The various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in the plan." (Gov. Code, § 65860, subd. (a).)

interests—including those of developers, neighboring homeowners, prospective homebuyers, environmentalists, current and prospective business owners, jobseekers, taxpayers, and providers and recipients of all types of city-provided services—and to present a clear and comprehensive set of principles to guide development decisions. Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions." (*Ibid.*)

In *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco*, *supra*, 102 Cal.App.4th at page 687, the appellate court upheld the board of supervisors' express determination that the project in question was consistent with the city's general plan and its priority policies. "[C]ourts accord great deference to a local governmental agency's determination of consistency with its own general plan, recognizing that 'the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role "is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies." [Citation.]' [Citation.] [¶] Moreover, state law does not require precise conformity of a proposed project with the land use designation for a site, or an exact match between the project and the applicable general plan. [Citations.] Instead, a finding of consistency requires only that the proposed project be '*compatible* with the objectives, policies, general land uses, and programs specified in' the applicable plan. [Citation.] The courts have interpreted this provision as

27

requiring that a project be "'in agreement or harmony with'" the terms of the applicable plan, not in rigid conformity with every detail thereof. [Citations.]" (*Id.* at pp. 677-678.)

And in *Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1511, the appellate court upheld the county's approval of a project, despite the fact it would be inconsistent with a wetlands protection element in the applicable specific plan. "A project is consistent with a county's general plan (and any specific plan adopted to further the objectives of the general plan) ""if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment.'" [Citation.] A given project need not be in perfect conformity with each and every general plan policy. [Citation.] To be consistent, a [project] must be "compatible with" the objectives, policies, general land uses and programs specified in the general plan. [Citation.]' [Citation.] [¶] In reviewing an agency's decision for consistency with its own plan, 'we accord great deference to the agency's determination. This is because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those polices when applying them in its adjudicatory capacity. [Citation.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role "is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies." [Citation.]' [Citation.] [¶] . . . [¶] . . . [G]eneral and specific plans attempt to balance a range of competing interests. It follows that it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. An agency, therefore, has the discretion to approve a plan even though the plan is not consistent with all of a specific plan's policies. It is enough that the proposed project will be compatible with the objectives,

28

policies, general land uses and programs specified in the applicable plan. [Citations.]" (*Id.* at pp. 1509-1511.)


## VI.

### *MOTION TO STRIKE PORTION OF REPLY BRIEF*

Saddleback filed a motion to strike a portion of Rutter Santiago's reply brief on appeal. In its reply brief, Rutter Santiago argues Saddleback did not raise the issue of the impropriety of the amendment to the open space portion of the Specific Plan in its comments to the draft EIR; according to Rutter Santiago, this issue was first raised in Saddleback's filings in the trial court. Therefore, Rutter Santiago claims in its reply brief that Saddleback failed to exhaust its administrative remedies, and this issue cannot be considered on appeal.

"In an action or proceeding to attack, review, set aside, void, or annul a finding, determination, or decision of a public agency made pursuant to this title at a properly noticed public hearing, the issues raised shall be limited to those raised in the public hearing or in written correspondence delivered to the public agency prior to, or at, the public hearing . . . ." (Gov. Code, § 65009, subd. (b)(1).)

Saddleback argues that because exhaustion of administrative remedies is a defense belonging to the County, Rutter Santiago is not permitted to raise it on appeal. While the purpose of the exhaustion doctrine is to apprise the governmental agency of all relevant legal contentions before litigation begins (*Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1394), it is not necessarily true that a nongovernmental agency defending the agency's actions on appeal cannot raise the defense. *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, cited by Saddleback, is not on point. In that case, the governmental agency conceded that all administrative remedies had been exhausted. (*Id.* at p. 1216.)

29

Saddleback also argues the issue of the open space amendment was fully litigated in the trial court, at which time Rutter Santiago never raised the failure to exhaust administrative remedies as a defense. Rutter Santiago counters that the specific issue for which, it claims, Saddleback failed to exhaust its remedies is that the amendment to the open space component conflicts with the General Plan's open space component.

The administrative record contains: (1) testimony that the use of man-made slopes as open space is not consistent with the definition of open space in current use; (2) a question at a public hearing on whether the County would prepare a new EIR for the amendments to the Specific Plan; (3) a comment at the public hearing that the change in terminology from "natural open space" to "open space" would have environmental impacts and was completely different from what had been understood about open space in the Specific Plan; (4) a written comment on the draft EIR by one of the petitioners, which criticizes the draft EIR on the open space issue because the Specific Plan requires at least 66 percent of the site to be maintained as "permanent, natural open space" (boldface & italics omitted), which implies the petitioner disagreed with the Specific Plan's amendment deleting the reference to "natural open space"; (5) a written comment from another of the petitioners, noting that "Section III.D.8.8.i. is attempting to get rid of the term "NATURAL" to allow for grading within the 66% of open space dedication, then after the development is built it can [be] called 'open space'. 'OPEN SPACE' is correct . . . open . . . space . . . nothing of value on it . . . dead space with removed natural habitat!" (boldface & underscoring omitted); (6) a written comment from one of the petitioners with the heading "The proposed [Specific Plan] amendment eliminating the word 'natural' from the open-space dedication requirement will produce significant, long-term environmental impacts that have not been adequately analyzed" (boldface & some capitalization omitted); and (7) written comments from homeowners, expressing concern over deleting the word "natural" from the open space portion of the Specific

30

Plan.  Based on the foregoing, we conclude the issue was adequately raised during the comment period, and Saddleback exhausted its administrative remedies regarding this issue.  We therefore grant the motion to strike section III.B.1.c. from Rutter Santiago's reply brief.

DISPOSITION

The judgment is reversed.  We direct the trial court to deny the petition for a writ of mandate and to enter judgment in favor of the County and the Board, and to vacate the peremptory writ of mandate.  In the interests of justice, no party shall recover costs on appeal.

FYBEL, J.

WE CONCUR:

ARONSON, ACTING P. J.

IKOLA, J.